IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TINA SANFORD, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-cv-956-MEF |
| | ) | |
| SLADE'S COUNTRY STORES, LLC, | ) | (WO- PUBLISH) |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, Tina Sanford ("Sanford") alleges that her former employer Slade's Country Stores, LLC[1] ("Slade's Stores") discriminated against her in relation to certain employment decisions because her son had a disability and retaliated against her after she filed her Charge of Discrimination with the Equal Employment Opportunity Commission. Pursuant to 42 U.S.C. § 12101, *et seq.*, the Americans with Disabilities Act ("ADA"), Sanford seeks redress. This cause is presently before the Court on Defendant Slade's Country Stores, Inc.'s Motion for Summary Judgment (Doc. # 28). The Court has carefully considered the undisputed evidence filed with the motion and the applicable law and discerned that the motion for summary judgment is due to be GRANTED in part and DENIED in part for the reasons set forth below.

---

[1] Slade's Stores has repeatedly noted that it is incorrectly named in the Complaint and consequently in the style of this case. Slade's Stores' proper name is apparently Slade's Country Stores, Inc. It is incumbent upon Sanford's counsel, not the Court to correct this error.

## JURISDICTION AND VENUE

Jurisdiction over this matter is properly asserted pursuant to 28 U.S.C. §1331.  The parties do not contest personal jurisdiction or venue and the Court finds adequate allegations of both.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed

to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, a party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir. 1990).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the

3

light most favorable to the non-moving parties, establish the following material facts:

**Slade's Stores**

Slade's Stores is an Alabama corporation owned by Gaines Slade and Ina Slade. They both worked for the corporation during the time period relevant to this case. It also appears that their son Gaines Slade Jr. ("Slade Jr.") played some role in the corporation's operations. While he did not have a specific title, Slade Jr. had authority to make decisions in Gaines Slade's absence. In the relevant time period, Slade's Stores owned convenience stores at four locations. These stores were located in Wetumpka, Pintlala, and Hope Hull, Alabama.

**Hiring of Sanford**

Slade's Stores hired Sanford in April of 2007. It is not entirely clear who made the decision to hire Sanford. Sanford's testimony is that her initial interview involved only Slade Jr. and Gaines Slade. (Doc. # 35-4 at ¶ 3).[2] During this interview, Sanford told the Slade Jr. that her youngest child had disabilities that required her to tend to his special medical and educational needs. (Doc. # 35-1 at p. 70, lines 9-15). Sanford has further provided sworn testimony to the effect that she also told Gaines Slade that her youngest child was disabled and had multiple medical and learning problems when she was first interviewing.[3] (Doc. #

---

[2] Gaines Slade cannot remember for sure if he hired Sanford himself. (Doc. # 30-2 at p. 25, lines 11-13). He opined that it could have been him or it could have been Debra Bass, who was at some point employed as bookkeeper for Slade's Stores and as such had hiring authority. *Id.*

[3] Through his testimony, Gaines Slade disputes the extent to which he had knowledge about the specific problems of Sanford's youngest child. Nonetheless, for purposes of resolving this motion, the Court must avoid resolving disputed issues of material fact and

35-4 at ¶ 3).   Initially, Sanford worked at one of the Hope Hull stores, but in May or June, she was asked to begin working at the Pintlala store.  Slade's Stores increased her pay when she began working at the Pintlala store.

**Health Insurance**

After ninety days of employment, employees of Slade's Stores had the opportunity to apply for health insurance coverage.  Slade's Stores paid half of the premium for each participating employee, and each participating employee was responsible for paying half of the premium.  Slade's Stores disclosed the existence of this employment benefit in its employee handbook.  According to Ina Slade's testimony, it was also customary for the company bookkeeper to disclose this to newly hired employees at the beginning of their employment and to provide new hires with a copy of the employee handbook.  (Doc. # 30-3 at p. 14, line 18 through p. 15, line 21).  Ina Slade admits, however, that she was not around for that process and cannot say whether any particular employee was told about the health insurance plan.  *Id.*

Sanford's testimony is that insurance was never offered to her during her employment with Slade's Stores.  Sanford testified that no one ever discussed any company insurance with her at the beginning of her employment and that no one ever gave her any forms relating to insurance.  There is no evidence before this Court from which a reasonable jury could find that anyone from Slade's Stores ever provided Sanford with a copy of the employee

_____

must construe the evidence in the light most favorable to Sanford.

handbook. Indeed, Sanford denies ever knowing one existed.[4]  Sometime after being moved to work at the Pintlala store in May or June of 2007, Sanford asked Gaines Slade if the company had any insurance, but he replied that he didn't have any company insurance.[5] Because Sanford was not offered the opportunity to participate in the health insurance offered to Slade's Stores employees after ninety days of employment, she went without health insurance coverage and was responsible for paying her medical bills out of her own pocket.

According to Sanford, sometime in the last sixty days of her employment with Slade's Stores,[6] a coworker mentioned in passing that she had health insurance coverage through her employment with Slade's Stores.  This was the first time Sanford heard anything about any Slade's Stores' employee having health insurance through the company.  After learning that this co-worker had insurance, Sanford eventually approached another co-worker, Mike Chesser, to ask if he also had insurance.  He indicated that he did and that he paid for some part of that insurance.

Sanford believes that Slade's Stores denied her the opportunity to participate in the health insurance plan because she had a handicapped child who required numerous

---

[4]  There is evidence before the Court that a copy of the employee handbook was maintained in each of the Slade's Stores locations, but there is no evidence that Sanford ever knew that it was there.

[5]  Gaines Slade denies that Sanford every asked about insurance.

[6]  Sanford's employment was terminated at the end of October of 2007.  This period is presumably sometime in September or October of 2007.

appointments and had significant medical expenses.  She believes this because Gaines Slade made comments about there being too many medical issues and too many personal problems with Sanford's family.  Further, Sanford testified that Gaines Slade approached her in the store one day and complained about the fact that she received social security disability payments for that child.  Gaines Slade told her she was "enabling this child."  He compared her child to Mike Chesser ("Chesser"), a store employee who had some sort of mental disabilities or problems.  Gaines Slade stated that he had "taken care" of Chesser and that Chesser had never drawn a penny (presumably, of government benefits).  He said that he had pushed Chesser to be independent and self-sufficient, but that she was just enabling her child and using his "tax-paying dollars" to do it.  Sanford was very embarrassed and humiliated by Gaines Slade's comments to her especially because customers were able to hear what he said.

**Sanford Is Promoted to Manager**

In mid-September of 2007, Gaines Slade approached Sanford about becoming the manager for the Pintlala store.  She accepted this promotion, but conditioned her acceptance on Gaines Slade's promise that if he was displeased with her performance as manager that she have a chance to be demoted to being a cashier again rather than fired outright.  At some point in September or October of 2007, Sanford threatened to resign.  To entice her to stay, Slade's Stores began to pay her a salary rather than paying her by the hour.  This constituted a better offer than Sanford had elsewhere and so she stayed.

**Problems During Sanford's Employment**

Sanford admits that during her employment at the Pintlala store, she was late to work on more than one occasion.  She cannot recall on how many occasions she was late to work.  Additionally, Sanford admits that she failed to remember to clock in and out of work properly using the time clock during her employment and that she knew it was unacceptable to fail to properly clock in and out.  She acknowledges that she and the other employees received a memo on this subject in April of 2007.  Other employees also had problems with tardiness to work and failure to properly use the time clock.

Sanford complains that during her employment she was sometimes not scheduled to work as much as she would have liked and at other times she was scheduled to work when she would have preferred not to do so.  She felt that Chesser was given preferential treatment especially when it came to matters of scheduling.

Shortly after Sanford became manager of the Pintlala store, Chesser confronted her because he needed to get off work in order to attend school.  Sanford was not scheduled to work on this particular day because her handicapped child had a doctor's appointment.  The employee who was supposed to relieve Chesser failed to show up for work.  Chesser came to Sanford's house and insisted that she come to the store immediately to relieve him because she was the manager and the employee scheduled to work had not come to work.  Sanford reminded Chesser that she had the day off because of her child's medical appointment, but

Chesser continued to insist that she come to the store so he could leave for school. Sanford finally relented and told him she would come to relieve him if he would give her thirty minutes to try to arrange child care. Chesser cursed at her, told her to forget it, and left. Sanford called Chesser to say she had arranged for childcare and would come in, but he refused her offer. The next day, Gaines Slade told Sanford that she should have come in to work for Chesser. Sanford replied that her child's needs were important and that Chesser knew she was scheduled to be off because of her child's appointment. Gaines Slade complained that Sanford was having to spend too much time with her child's problems. Gaines Slade was angry with her and told her that it was very important that nothing interfered with Mike's schooling. Gaines Slade fired the employee who had caused the problem by failing to show up as scheduled for work. He then hired Ann Hopkins ("Hopkins"). Sanford worked with Hopkins to train her.

**Termination of Sanford's Employment**

Hopkins called Gaines Slade to report that she had witnessed Sanford taking items of food from the store without paying for them; that she suspected Sanford had taken money while the registers at the store were down for a system conversion and sales were being tracked manually; and that Sanford and her boyfriend had been in a screaming and cursing argument which escalated into a physical fight in the store's parking lot during Sanford's

shift.[7]  According to Hopkins' account to Gaines Slade, these events occurred during the week of October 22, 2007, when the Slades were away from town.  Hopkins reported the events to Gaines Slade on October 29, 2007.

On October 30, 2007, Slade's Stores terminated Sanford's employment.  Gaines Slade made the decision to terminate Sanford's employment, and he communicated that decision to Sanford himself.  Sanford repeatedly asked why she was being fired.  Gaines Slade repeatedly refused to tell her.  After leaving, Sanford telephoned Ina Slade to ask why she had been fired, but Ina Slade said that she did not know what had happened or why Gaines Slade was terminating Sanford's employment.  During the course of this litigation, Gaines Slade attributed his decision to terminate Sanford's employment to: (1) the conduct that Hopkins had reported involving theft from the store and the fight in the parking lot during Sanford's shift; and (2) Sanford's prior problems regarding failure to open the store on time, failure to clock in for her shift, complaints from customers about Sanford, and comments he heard Sanford make to a customer disparaging the store's prices.  Gaines Slade denied that the decision to terminate Sanford's employment had anything to do with her child's disability.

After losing her job, Sanford sought unemployment compensation.  Slade's Stores fought the award of benefits to Sanford, but eventually she received them.  In January of

---

[7] Sanford denies that she did any of the things that Hopkins told Gaines Slade she had done.  Sanford's boyfriend also denies that he was involved in an argument with Sanford at the Pintlala store as Hopkins has described.

2008, Sanford filed a Charge of Discrimination with the Equal Employment Opportunity Commission in which she claimed to have been discriminated against on the basis of her child's disability.

## DISCUSSION

### A.  ADA Retaliation Claim

In her Complaint, Sanford alleges that Slade's Stores retaliated against her for pursuing her rights under the ADA following the termination of her employment by interfering with her right to qualify for and receive benefits earned and due her.  Slade's Stores seeks judgment as a matter of law on this ADA retaliation claim on several grounds, including that Sanford's failure to exhaust her administrative remedies with respect to this claim in a timely fashion presents a legal bar to her litigating this claim now.  In response, Sanford concedes that she did not exhaust her administrative remedies, as the law requires, with respect to her ADA retaliation claim.  Further, she acknowledges that the claim is due to be dismissed.  The Court agrees that Sanford's ADA retaliation claims are legally barred and Slade's Stores is entitled to judgment as a matter of law on those claims.

### B.  Association Discrimination Claim Relating to Termination of Employment

As the Eleventh Circuit Court of Appeals has explained,

> [t]he ADA mandates that covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §

11

> 12112(a).  Under the Act, the term "discriminate" is defined to
> include, among other factors, "excluding or otherwise denying
> equal jobs or benefits to a qualified individual because of the
> known disability of an individual with whom the qualified
> individual is known to have a relationship or association."  42
> U.S.C. § 12112(b)(4).

*Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001).  "A family

relationship is the paradigmatic example of a relationship under the association provision of

the ADA."  *Hartog v. Wasatch Academy*, 129 F.3d 1076, 1082 (10th Cir. 1997) (applying

association provision of the ADA to claims of an employee whose son suffered from a

mental disability); *Rocky v. Columbia Lawnwood Reg'l Med. Ctr.*, 54 F. Supp. 2d 1159, 1164

(S.D. Fla. 1999) (applying association provision of the ADA to claims of an employee whose

son  had a disability);  *see also* 29 C.F.R. § 1630.8 (2009).

     As in other types of discrimination cases, a plaintiff proceeding with an association

discrimination claim under the ADA may rely on direct or circumstantial evidence.  Sanford

offers no direct evidence of discrimination.  Accordingly, this Court will analyze this case

as one based upon circumstantial evidence.  *See, e.g., Wascura,* 257 F.3d at 1242 (applying

Title VII burden shifting analysis[8] to case brought pursuant to the ADA based on

---

     [8]  The United States Supreme Court has set forth a burden-shifting scheme for
discriminatory-treatment cases.  Under this scheme, a plaintiff must first establish a *prima
facie* case of discrimination.  The burden then shirts to the employer to articulate a legitimate,
nondiscriminatory reason for the challenged employment action.  If the employer meets this
burden, the presumption of intentional discrimination disappears, but the plaintiff can still
prove disparate treatment, by offering evidence demonstrating that the employer's
explanation is pretextual.  *See, e.g., Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n.3 (2003).

circumstantial rather than direct evidence); *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441

(11th Cir. 1998) (applying *McDonnell Douglas* burden shifting framework in an ADA case);

*Hartog*, 129 F.3d at 1085.   To establish a *prima facie* case of association disability

discrimination under either statute using circumstantial evidence, a plaintiff must establish

> (1) that she was subjected to an adverse employment action; (2)
> she was qualified for the job at that time; (3) that her employer
> knew at that time that she had a relative with a disability; and (4)
> that "the adverse employment action occurred under
> circumstances which raised a reasonable inference that the
> disability of the relative was a determining factor in [the
> employer's] decision."

*Wascura,* 257 F.3d at 1242 (*quoting Hilburn v. Murata Elec. N. Am., Inc.,* 181 F.3d 1220,

1226 (11th Cir. 1999)).

Slade's Stores contends that it is entitled to summary judgment on Sanford's ADA

discrimination claim arising out of the termination of her employment because Sanford

cannot establish one or more of the required elements of the *prima facie* case.  Slade's Stores

contends that Sanford was not qualified for her job at the time of her dismissal.  Specifically,

Slade's Stores contends that Sanford's failure to meet its time and attendance requirements

during her employment compels the conclusion that she was not "qualified" for her position

within the meaning of the ADA.  Sanford counters that she was qualified because she

successfully performed the requirements of her position with Slade's Stores and even earned

a promotion shortly before the termination of her employment.[9]  Thus, the contentions of the parties require the Court to more fully examine the meaning of "qualified" within the context of an ADA association discrimination claim.

The Eleventh Circuit Court of Appeals has followed a line of cases which holds that a non-disabled employee who violates a neutral employer policy concerning attendance or tardiness may be dismissed even if the reason for the absence or tardiness is to care for the employee's disabled associate because the failure of the employee to comply with the attendance requirements of her job renders her not qualified for purposes of establishing a *prima facie* case of association discrimination.  *See, e.g., Hilburn v. Murata Electronics N. Am., Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999) (favorably invoking the reasoning of *Hartog v. Wasatch Academy,* 129 F.3d 1076 (10th Cir. 1997) and *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209 (4th Cir. 1994).  "[T]he associational provision of the ADA does not require employers to make any 'reasonable accommodations' for the disabilities of relatives or associates of a nondisabled employee."  *Rocky*, 54 F. Supp. 2d at 1165 (collecting cases).  When the legislative history for the association provision of the ADA is examined, it is clear that the Congress intended to "prevent an employer from making an unfounded assumption that an employee who has an association with a disabled person will miss work in order to care for that person," but allows that an employee who has an association with a disabled

---

[9]  Importantly, Sanford neither offers case law supporting her contention that this type of job performance satisfies the "qualifed" element of the *prima facie* case, nor addresses the case law on which Slade's Stores relies for this contention.

person to be dismissed for violating a neutral policy concerning attendance or tardiness even if the reason for the absence or tardiness is to care for the disabled associate. *Id.* (citing H.R. Rep. No. 101-485, pt.2, at 61-62). Following *Hilburn*, district courts have granted summary judgment on ADA association claims in favor of employers who fired employees who failed to regularly and punctually attend work even if the reasons for the absences or tardiness were the need to care for a disabled associate. *See, Pittman v. Moseley, Warren, Prichard & Parrish*, 3:01cv279-J-21TJC, 2002 WL 2007880, at * 4 (M.D. Fla. July 29, 2002) (Holding that "[a]n individual is not qualified for his job if he is unable to meet the attendance requirements of the job" and granting employer summary judgment on ADA association discrimination claim); *Rocky*, 54 F. Supp. 2d at 1166 (finding that employee failed to establish first element of *prima facie* case of association discrimination under the ADA because employee was repeatedly absent or tardy). Thus, while cases brought under other employment discrimination provisions impart quite a different meaning to the requirement that an employee be "qualified," it is clear that for the type of claim Sanford makes she must show that she was qualified for her position by establishing that she regularly and punctually attended work.

While Sanford denies ever being late for work while she was assigned to the Hope Hull location, she admits that she was late to work after she was assigned to the Pintlala location. She further admits that she was late to work more than once, but could not put a number on how many times. Slade's Stores submitted into evidence the time cards it

required Sanford and its other employees to use to track their time using a time clock. Sanford also admits that during her employment she failed to remember to clock in and out properly using the time clock and that she knew it was required that she do so.

Because Sanford cannot remember how many times she was late, the Court has reviewed Sanford's time cards, as submitted by Slade's Stores.[10]  It is clear that on eighteen occasions Sanford failed to clock in at the beginning of her shift.[11]  Twice she attributed that failure to the absence of the time card when she arrived at work.  She also failed to clock out properly on two occasions.  With respect to the timeliness of Sanford's arrival for her shifts, the Court is somewhat hampered by the failure of Slade's Stores to provide any record of the times Sanford was expected to be at work on each of the days she was scheduled. Nevertheless, the Court has been able to identify numerous days when Sanford was late[12] to work: June 5 (6:06 a.m.), June 11 (6:02 a.m.), June 12 (5:58 a.m.), June 20 (6:12 a.m.), June 22 (5:55), June 29 (5:53 a.m.), July 3 (6:00 a.m.),  July 10 (6:01 a.m.), July 14 (5:57 a.m.), July 17 (6:15 a.m. per Sanford's handwritten note), August 4 (6:30 a.m. per Sanford's handwritten note), August 7 (5:47 a.m.), August 10 (5:53 a.m.), August 19 (8:04), August 31 (5:46 a.m.), September 4 (5:59 a.m), September 7 (6:19 a.m.), September 15 (6:06 a.m.),

---

[10]  Sanford has made no issue about the accuracy of any of the time cards included in Slade's Stores evidentiary submission.

[11]  An employee's failure to properly clock in makes it difficult, if not impossible, for an employer to document whether the employee actually arrived for work on time.

[12]  All dates listed are dates when Sanford was assigned to open the store at 6:00 a.m. and clocked in or arrived after 5:45 a.m.

September 21 (6:49 a.m.), September 25 (6:27 a.m.), September 26 (5:48 a.m.), October 3, (5:58 a.m.), October 8 (5:53 a.m.), October 9 (5:55 a.m.), October 12 (5:51 a.m.), October 13 (6:21 a.m.), October 17 (5:51 a.m.), October 19 (6:03 a.m.), October 20 (5:48 a.m.), October 29 (6:10 a.m.), and October 30 (5:54 a.m.).[13]  Many of these shifts  when Sanford was late, she was assigned to open the store and her tardiness meant that the store would not be opened as scheduled.   According to Gaines Slade's testimony, people were telling him that the store was not open as scheduled at six o'clock and this made him suspicious about the days when Sanford reported that she had arrived at work on time, but had forgotten to clock in.  When Sanford was assigned to open the store at 6:00 a.m., Gaines Slade expected her to be present in the store at least fifteen or twenty minutes before 6:00 a.m. to get the money drawers set up and the coffee made before the store opened.

No reasonable trier of fact could view the foregoing evidence and find that Sanford regularly and punctually attended work from early June of 2007 through the date of the termination of her employment in late October of 2007.  Under the applicable case law, the Court is compelled to find that as of October 30, 2007, Sanford was not qualified for her

---

[13]   The Court notes that even Sanford seemed to understand that when she was assigned to open the store she needed to arrive before the time at which the store was to open.  On a number of days, Sanford arrived before 5:45 a.m.  Moreover, even if the Court only counts Sanford as late on days when she clocked in after 6:00 a.m. when the store was scheduled to open at that time, there are still approximately fourteen days on which Sanford clocked in at 6:00 a.m. or later.  According to her time cards, Sanford worked in the Pintlala store from mid-May of 2007, until the end of October of 2007, usually working five days a week and often working at times other than the opening shift.  Consequently, her tardiness is undisputably significant.

position within the meaning of the association provision of the ADA.  For this reason, the Court agrees that Sanford has failed to make out a required element of her *prima facie* case of association discrimination under the ADA with respect to the decision to terminate her employment.  Because Sanford has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof, Slade's Stores is entitled to judgment as a matter of law on this claim.[14]

## C.  Association Discrimination Claim Relating to Denial of Insurance Benefit

Sanford's sole remaining claim is that Slade's Stores denied her health insurance during her employment because of her association with her disabled child.  Slade's Stores seeks summary judgment on this claim as well, but it is not entirely clear which of the elements of the *prima facie* case it contends Sanford cannot establish.

Clearly, the denial of such a benefit was intended to be within the scope of the ADA association discrimination claims available to employees.  "It is unlawful for a covered entity to exclude or *deny equal jobs or benefits* to, or otherwise discriminate against, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association."  29 C.F.R. § 1630.8 (2009) (emphasis added).  In fact, this Court has said that the type of

---

[14]  Because of this finding, the Court need not and does not reach the other issues raised concerning other elements of the *prima facie* case or whether the proffered legitimate non-discriminatory reasons for the termination of Sanford's employment were a pretext for discrimination.

benefits that the "ADA intended to protect from discrimination are privileges such as *health and life insurance benefits*, retirement funds, profit-sharing, paid holidays, vacation, and sick leave." *Atkinson v. Wiley Sanders Truck Lines, Inc.*, 45 F. Supp. 2d 1288, 1293 (M.D. Ala. 1998) (emphasis added). The Interpretive Guidance on Title I of the ADA specifically elaborates on this as well providing:

> "[t]his provision also applies to other benefits and privileges of employment. For example, an employer that provides health insurance benefits to its employees for their dependents may not reduce the level of those benefits to an employee simply because that employee has a dependent with a disability. This is true even if the provision of such benefits would result in increased health insurance costs for the employer.

29 C.F.R. app. § 1630.8. Despite, or perhaps because of, the clear protection provided by the ADA against this type of discrimination, this Court has had significant difficulty locating decisions involving these kinds of claims generally. The Court has only been able to locate one case which involved a claim that an employee was denied equal access to health insurance coverage because of her family member's disability and associated medical expenses. *See Torres-Soto v. ARB Recycling, Inc.*, No. Civ. 04-1346(HL), 2005 WL 1640872 at *1 (D. Puerto Rico July 8, 2005). That case sets forth the following four element *prima facie* case for association discrimination: (1) that the employee was qualified for the job at the time of the adverse employment action; (2) that she suffered an adverse employment action at the hands of the employer; (3) that the employer knew that the employee had a relative or associate with a disability; and (4) that the adverse employment

action at issue occurred under circumstances raising a reasonable inference that the associate's disability was a determining factor in the employer's decision.  *Id.* at *6.  In that case, however, the Court was not called upon to address whether the employee was "qualified" for purposes of the *prima facie* case because the employer did not argue that the employee could not establish that element.  *Id.* at *6.

With respect to whether Sanford was "qualified" at the time she was denied the opportunity to apply for the health insurance benefits Slade's Stores provided, Slade's Stores may be again arguing that her chronic problems with tardiness rendered her unqualified for purposes of establishing a *prima facie* case.  When the evidence on this claim is viewed in the light most favorable to Sanford, it establishes that Slade's Stores failed to disclose the existence of its health insurance plan, lied to Sanford when she later asked about it, and failed to provide her with the same coverage that she and other employees became eligible to receive after ninety days of employment.  This denial at the ninety day mark seems to be the pertinent time to examine Sanford's qualifications.  Even if the definition of qualified for purposes of the *prima facie* case is the same as other association discrimination claims under the ADA, Sanford would have been qualified at that point in that she would not have had the excessive number of instances of tardiness accumulated at that date.[15]  What seems more

---

[15]  Evaluating Sanford's "qualification" at the end of her term of employment makes no logical sense here as that was not when she was denied the benefit.  Additionally, the Court is not entirely persuaded that Sanford should be required to show that she was qualified by virtue of her punctual and reliable attendance when the issue is not continuing to be employed in the position, but rather receiving access to a benefit.

germane is whether Sanford was qualified for the benefit, here health insurance, at the time she was denied equal access to it.  If attendance and punctuality were not specified prerequisites for all plan participants, they ought not to be part of what makes Sanford qualified to participate in the health insurance plan.  It is well-settled that "[t]he prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.' " *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  To be at all logical, the term "qualified" individual within the context of a denial of a benefit must be tied back to the that which was denied, namely, the decision to deny benefits.  The seminal inquiry there should be whether the employee is "qualified" for the job benefit denied.  The Court is satisfied that when the evidence is viewed in the light most favorable to Sanford, she has established that she was qualified to be allowed to participate in the health insurance plan after ninety days of employment with Slade's Stores.

Relying on facts which Sanford's sworn testimony puts into dispute, Slade's Stores contends that Sanford suffered no adverse employment action with respect to a benefit during her employment.  Slade's Stores argues that Sanford did not seek company health insurance.  This ignore's Sanford's testimony that she had asked Gaines Slade about health insurance and told it was not available.  Furthermore, Slade's Stores offers no evidence that it ever

informed Sanford about the existence of the insurance or provided her with a copy of the handbook which described it.  Nevertheless, Slade's Stores faults Sanford for not asking further questions about it after the company owner had denied its existence simply because a coworker mentioned its existence.   The Court finds sufficient evidentiary support for this element of the *prima facie* case.

When the evidence is viewed in the light most favorable to Sanford, it is also clear that she has adduced sufficient evidence to support the third element of the *prima facie* case. Sanford told both Slade Jr. and Gaines Slade at her initial interview that her son had a disability.  Even Gaines Slade's own testimony belies that he was aware that her son was disabled.  Moreover, Sanford has established that she had requested and received time off work to take her child to medical or school counseling appointment for his problems during her employment with Slade's Stores and had disclosed the reason for needing the time off when she sought it.  Finally, based on the evidence before it, the Court finds that a jury question exists as to whether the circumstances raise a reasonable inference that Sanford's son's disability was a determining factor in the employer's decision to deny her the opportunity to participate in the health insurance available.

Having found that Sanford has established a *prima facie* case of association discrimination under the ADA with respect to the denial of access to the company health insurance plan, the Court turns to Slade's Stores' articulated reason for its actions with respect to health insurance for Sanford and her family.  Slade's Stores' proffered reason is

22

that it did not provide health insurance to Sanford and her sons because Sanford never asked about it or applied for it.  As previously outlined, the material facts relating to this point are disputed.  These factual disputes relating to the health insurance issue create a jury question as to whether Slade's Stores' proffered legitimate, non-discriminatory reason for failing to provide Sanford with the opportunity to participate in its health insurance benefit was a pretext for discrimination against Sanford on the basis of her association with her disabled son.  For this reason, the motion for summary judgment is due to be DENIED with respect to this claim.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1.  Defendant Slade's Country Stores, Inc.'s Motion for Summary Judgment (Doc. # 28) is GRANTED in PART and DENIED in PART.

2.  It is GRANTED with respect to Sanford's retaliation claim and her association discrimination claim relating to the termination of her employment.

3.  Having found that Defendant is entitled to judgment as a matter of law as to Sanford's retaliation claim and her association discrimination claim relating to the termination of her employment, those claims are DISMISSED WITH PREJUDICE.

4.  The motion is DENIED with respect to Sanford's ADA association discrimination claim relating to the denial of equal opportunity to participate in the company health insurance plan.

23

DONE this the 7th day of April, 2010.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE
